IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KHALIA FREEMAN : | |
| : | CIVIL ACTION |
| v. : | |
| : | NO. 21-3515 |
| MOORE EYE CARE, P.C., d/b/a : | |
| MOORE EYE INSTITUTE : | |

**MEMORANDUM**

**Chief Judge Juan R. Sánchez**                                                               **July 5, 2022**

Defendant, Moore Eye Care moves for the entry of summary judgment in its favor on Plaintiff Khalia Freeman's claims that Moore's termination of her employment as a front desk receptionist violated the Americans with Disabilities Act, 42 U.S.C. § 12101, *et. seq.* and the Pennsylvania Human Relations Act, 43 P.S. § 951, *et. seq.* Inasmuch as the Court finds there is no evidence in the record to support Freeman's contention that her termination resulted from unlawful discrimination, the motion shall be granted.

**FACTUAL BACKGROUND**

Moore Eye Care hired Freeman as a front desk receptionist in April 2019 and she remained in this position until her termination on June 26, 2020. Freeman's job was full-time, paid $15 per hour, and involved registering and interacting with patients, scheduling appointments, scanning and faxing documents, collecting co-payments, and sometimes travelling from Moore's Springfield, Pennsylvania office to one of its satellite locations in Abington or South Philadelphia. Pl's Dep., 14-18, ECF 11-5. The practice typically had three or four doctors on duty and saw some 80 patients in its Springfield office each day, most of whom were between 60 and 80 years of age

1

or older. *Id.* at 17. Throughout the course of Freeman's employment, Michelle Gallo was the practice administrator and Freeman's manager, although for a brief period of time, Freeman reported directly to Brittany Vanacey, a floor manager in the Springfield office. Dep. of Amber Starling at 20, ECF 11-11; Dep. of Michelle Gallo at 15, ECF 18-4. Although Moore did not give formal employee evaluations, there were no real concerns or dissatisfaction with Freeman's job performance. Gallo Dep. 34-35; Starling Dep. 22-24.

Following the onset of the COVID-19 pandemic in March 2020, Moore's Springfield office remained open, but was not fully-staffed. Many of its employees, including Freeman, were furloughed for approximately six weeks. Gallo Dep. 36-40. In response to the pandemic, Moore instituted a number of changes and put a number of COVID protocols into place in its offices to protect the health and safety of its patients and employees. Upon Moore's return to full-staffing in late May 2020, there were new guidelines requiring thorough cleaning of examination and treatment rooms between patients, the mandatory masking of all employees and patients, wearing of disposable gowns, shoe coverings, gloves, hair coverings, and face shields by technicians, assistants and physicians, and daily temperature checks of all incoming patients and employees. Gallo Dep., 42-43, 49-51; Starling Dep., 15; Dep. of Tammy Aikins, 17-19, ECF 11-16; ECF 11-15. Additionally, hard plastic protective shields were put up at the front desk, social distancing practices were implemented, and everyone was asked questions about whether they had travelled out of state in the past 14 days, tested positive or been exposed to anyone who had contracted COVID, or felt ill. Employees were not allowed to travel to any so-called COVID "hot spots," and were directed to follow the CDC guidelines. Gallo Dep. 44-46; Starling Dep. 16-19; Aikins Dep. 16, 19-23. Employees were also told to stay home if they felt sick, and they and those who

stayed home sick were required to get tested and bring back the results to return to work. Gallo Dep. 48-49; Aikins Dep. 20.

In June 2020, Freeman made plans to travel to Atlanta, Georgia, and requested permission from Brittany Vanacey to take June 18 and 19 off from work for that purpose. ECF 11-17. Vanacey granted her leave request and Freeman travelled to Atlanta, returning on Sunday, June 21, 2022. The following day, Freeman felt ill with "stomach issues" which she attributed to something she ate or drank and called out sick from work. Freeman Dep. 48-51. A day later, on Tuesday, June 23, Freeman returned to work. *Id.* at 52. Although Freeman said she felt fine, her co-workers observed that she was going back and forth to the restroom, appeared to have a runny, sniffily nose, kept taking her own temperature and putting her head down on the table, and was coughing and complaining of not feeling well. Starling Dep. 38-39; Aikins Dep. 34-35; Gallo Dep. 70-71. Freeman continued to come into work over the next several days and testified she felt fine until Thursday, June 25, when she felt like she was experiencing a head cold. Freeman Dep. 52-53. After taking some medicine and going to sleep after work that day, Freeman again felt fine and went to work the following day. She never felt ill after Thursday. *Id.* On Thursday, however, three other Moore employees - Starling, Aikins and one of the other technicians, Eddy Johnson, all began to feel ill with cold-like symptoms. Starling Dep. 41; Aikins Dep. 35-40; Gallo Dep. 69-70. Sometime that afternoon, Starling and Johnson went to Gallo and reported they weren't feeling well, and that Freeman had appeared to be ill earlier in the week. Starling Dep. 41-44; Gallo Dep. 69-71. Gallo responded she wasn't feeling very well either, and said they all needed to get COVID tests and couldn't return to work until they received negative results. Aikins Dep. 40.

Gallo also then told Freeman she needed to leave the office, get COVID tested and return after she received her results. In response, Freeman rolled her eyes and asked, "what if I don't get

tested?" Gallo Dep. 72-73.  Gallo informed her she couldn't come back to work until she did so. *Id.;* Freeman Dep. 54-55; Freeman Dep. 54-55.

Two days later, on Sunday June 28, 2020, Gallo called and texted Freeman to see how she was feeling and whether she had decided to get tested. Freeman said she was feeling fine and was going to go get tested.  Gallo Dep., 78-79, 82-83, Exh. 8.  At some point, the conversation became heated and Freeman believed Gallo thought she had gotten other employees sick.  The conversation ended with Freeman saying "F-you" to Gallo and hanging up on her.  *Id.* at 79-80; Freeman Dep., 70-73.  The same day, Freeman also had a phone conversation with Aikins during which Aikins advised her to just go get tested, they all had to do it and it wasn't a big deal.  Freeman was angry at Starling for telling Gallo she wasn't feeling well and that Freeman also appeared to be sick. Freeman told Aikins: "Amber need to mind her F-ing business…that fat-ass Amber.  I got something for her because she always opening her mouth." Aikins Dep. 45-47.  Aikins relayed Freeman's words to Starling because she thought they were a threat.  *Id.* at 48.  Starling responded: "That little girl got a problem.  All she got to do is just go get tested. Just to cover my ass, I'm going to tell Michelle, just in case she come up there, you know to try to do something to me at work or whatever." *Id.* at 49.  Aikins assumed Starling reported this to Gallo.  *Id.*

In fact, Starling did report Freeman's threat to Gallo, and Gallo called Aikins to verify what Freeman said.  *Id.* at 50-54; Gallo Dep. 85-86.  Later that same day, Sunday, June 28th, Gallo called Freeman and terminated her employment for threatening another employee and insubordination. *Id.* at 86-92, Exh. 8, 9.  The following day, Freeman submitted to a COVID test, which was positive.  Freeman Dep. 59-60.

Freeman filed her Complaint commencing this action on August 6, 2021 alleging she was terminated "based on a perceived disability (COVID-19)" Compl. ¶ 19, in violation of the

4

Americans with Disabilities Act (ADA) (Count I), and the Pennsylvania Human Relations Act (PHRA) (Count II).  Moore maintains it terminated Freeman's employment because she was insubordinate to her supervisor and threatened another employee.  Contending that discovery has revealed no evidence of any discrimination on its part, Moore now moves for the entry of judgment in its favor as a matter of law.[1]

**LEGAL STANDARDS**

Federal Rule of Civil Procedure 56 empowers a party to move for summary judgment on any claim or defense or any part of a claim or defense, and states that judgment shall be entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine dispute exits 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Stone v. Troy Construction, LLC,* 935 F.3d 141, 148, n. 6 (3d Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  And "[a]s to materiality, … [o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment…; [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248.  Under subsection (c) of the Rule, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials

---

[1] Relying on Freeman's W-2 and Earnings Summaries for 2019 and 2020 and her 2020 Income Tax Return, all of which denote "Eye Services MSO Inc." as the employer, Moore also argues it cannot be held liable under the ADA or the PHRA as it was not Freeman's employer.  ECF 11-7 – 11-9.  The Court finds no merit to this contention insofar as Moore's Employee Handbook specifically provides in relevant part:

> "Moore Eye Institute is composed of: Moore Eye Care, P.C.., Retina and Diabetic Eye Specialists, and Eye Services MSO.  We will simply refer to each of these entities as "Moore" or the "Practice" in this Handbook."

ECF 11-12, 11-10.

5

in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … , admissions, interrogatory answers or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A "judge's function" in evaluating a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Salazar-Limon v. City of Houston,* 137 S. Ct. 1277, 1280 (2017) (quoting *Anderson*, 477 U.S. at 249). "In so doing, the court must 'view the facts and draw reasonable inferences in the light most favorable to the party opposing the motion.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 378, (2007)). "A party will not be able to withstand a motion for summary judgment merely by making allegations." *In re Tribune Media Co.*, 902 F.3d 384, 392-393 (3d Cir. 2018) (quoting *In re Ikon Office Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002)). "Instead, the nonmoving party must 'designate specific facts' in the record to 'show that there is a genuine issue for trial.'" *Id.* (quoting *Celotex v. Catrett*, 477 U.S. 317, 324 (1986)). Thus, in order to survive summary judgment, an opposing party must show "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249.

**DISCUSSION**

Freeman asserts she was unlawfully terminated because Moore regarded her as disabled based on its belief that she had COVID-19, and because Gallo thought she had gotten other employees sick. Compl. ¶¶ 18-19, 21, 25; Freeman Dep. 72-73.

Under the ADA, a covered entity[2] is prohibited from discriminating "against a qualified individual on the basis of disability in regard to … the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  The statute goes on to clarify "[t]he term 'disability' means, with respect to an individual  (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(a)(1).  Further, for purposes of paragraph 1(C), "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A).  However, "[p]aragraph 1(C) shall not apply to impairments that are transitory and minor.  A transitory impairment is an impairment with an actual or expected duration of 6 months or less." *Id.* § 12102(3)(B).

> The language of the PHRA is broader but also makes it unlawful for:
>
> any employer because of the ... non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire, or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

43 P.S. § 955(a).  The PHRA further states, "it shall also be an unlawful discriminatory practice … [f]or any employer, employment agency or labor organization, prior to the employment,

---

[2] A "covered entity is "an employer, employment agency, labor organization or joint labor-management committee." 42 U.S.C. § 12111(2).

contracting with an independent contractor or admission to membership, to: …[d]eny employment because of a prior handicap or disability. …" *Id.* § 955(b)(5). The ADA and the PHRA are to be interpreted consistently and have the same standard for determination of liability. *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 273 (3d Cir. 2012) (citations omitted). As a result, courts commonly dispose of both ADA and PHRA claims on the same grounds. *Bialko v. Quaker Oats Co.*, 434 F. App'x. 139, 142, n. 5 (3d Cir. 2011). To prevail on an action under the statutes, a plaintiff must establish that [s]he is a "qualified individual" with a "disability" who suffered an adverse employment action because of that disability. *Id.* (citing *Turner v. Hershey Chocolate USA,* 440 F.3d 604, 611 (3d Cir. 2006)). To satisfy the requirement of having a "disability," a plaintiff may demonstrate any one of: an actual mental or physical impairment that substantially limits one or more major life activities, a record of such impairment, or that his employer regarded him as having a disability. *Id.* (citing *Marinelli v. City of Erie,* 216 F.3d 354, 359 (3d Cir. 2000)).

In assessing claims of disability discrimination where direct evidence is lacking, the courts apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 511 (2002). Under this framework, plaintiff has the initial burden to establish a prima facie case of disability discrimination. *Id.; Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000). To satisfy this burden, a plaintiff must show: (1) that [s]he is a disabled person within the meaning of the ADA; (2) that [s]he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) that [s]he suffered an adverse employment action because of [her] disability. *Gardner v. SEPTA*, 410 F. Supp. 3d 723, 734 (E.D. Pa. 2019) (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir.1999). *aff'd,* 824 F. App'x. 100 (3d Cir. 2020) and *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010)). Once a prima facie case has been established, the burden shifts to the

defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Alnajar v. Drexel Univ. Coll. of Med.*, 663 F. App'x 142, 145, fn. 4 (3d Cir. Sept. 28, 2016) (citing *Shaner*, 204 F. 3d at 500.  The defendant's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the adverse action.  *Mills v. Temple Univ.,* 869 F. Supp. 2d 609, 628 (E.D. Pa. 2012) (citing *Woodson v. Scott Paper Co.,* 109 F. 3d 913, 920, n. 2 (3d Cir. 1997).  If the defendant articulates a legitimate reason, the Plaintiff must then "demonstrate by competent evidence that the presumptively valid reasons … were in fact a cover-up for a … discriminatory decision." *McDonnell Douglas*, 411 U.S. at 805.

      Where, as here, a plaintiff asserts a "regarded as" claim of disability discrimination, she must establish "she has been subjected to an action prohibited under the ADA because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Eshelman v. Patrick Indus.,* 961 F.3d 242, 245 (3d Cir. 2020) (quoting 42 U.S.C. § 12102(3)(A)).  "An employer regards an employee as disabled when it 'misinterprets information about an employee's limitations to conclude that the employee is incapable of performing' his or her job requirements."  *Id.* (quoting *Ross v. Kraft Foods N. Am., Inc.,* 347 F. Supp. 2d 200, 204 (E.D. Pa. 2004)).  "The ADA includes 'regarded as' claims because being perceived as disabled 'may prove just as disabling' to a person as another type of physical or mental impairment."  *Id.*  Similarly, "[u]nder the PHRA's 'regarded as' standard, the relevant inquiry is whether the employer perceived the plaintiff as disabled within the meaning of the PHRA and, thus, is a question of intent, and not whether plaintiff was actually disabled at the time of the adverse employment actions. *Koci v. Central City Optical Co.*, 69 F. Supp. 3d 483, 489 (E.D. Pa. 2014) (quoting *Rubano v. Farrell Area School Dist.,* 991 F. Supp. 2d 678, 694 (W.D.

Pa. 2014)). "The plaintiff must also show that her employer believed that her perceived disability substantially limits a major life activity." *Id.*

Examining the record in this matter, although Freeman was clearly qualified for the job which she held for over a year and suffered an adverse employment action by virtue of her termination, there is no evidence from which a reasonable jury could find she was either disabled or regarded as disabled by Moore. At most, the evidence suggests that Moore may have suspected Freeman had COVID upon her return from Atlanta. This is why Gallo directed Freeman to leave the office on the afternoon of Friday, June 26 and get tested, and said she couldn't return to work without having done so. Freeman Dep. 52-55.[3] These were the same actions which Gallo herself took and the same directions which she gave to Aikins, Starling and Moore. Aikins Dep. 40. Aside from requiring Freeman to test for COVID before returning to the office, Gallo never relayed any concerns about limitations on Freeman's ability to continue working for Moore upon receiving a negative result, nor did Freeman ever hear anyone refer to her as disabled. Freeman Dep., 58-59.

Moreover, despite testing positive, Freeman never required or sought any medical care, and experienced no symptoms after Thursday, June 25. *Id.* 58-61, 69. Again, "transitory" and "minor" impairments do not qualify for protection under the "regarded as" prongs of the statutes, and "a transitory impairment is an impairment with an actual or expected duration of six months or less." § 42 U.S.C. § 12103(3)(B). Whether an impairment is both transitory and minor must be determined objectively. *Eshelman*, 961 F.3d at 247 (citing 29 C.F.R. § 1630.15(f)). Both elements must be considered. *See id,* at 248; *Matias v. Terrapin House, Inc.*, No. 21-2288, 2021 WL 4206759 at *2 (E.D. Pa. Sept. 16, 2021). Freeman testified she felt unwell for only a few days

---

[3] In fact, Freeman herself agreed Gallo's concern was reasonable given Moore is a medical practice which serves a lot of elderly patients, and that it was reasonable for Moore to not want her in the office because she had been feeling sick. Freeman Dep., 17, 55-56, 70, 74-75.

which she later learned was a result of having contracted COVID-19, and she quarantined for some ten days after receiving her positive test result. With the exception of taking over-the-counter Mucinex, Freeman took no other medications and sought no medical care for her symptoms. Freeman Dep., 60-61. Shortly after her termination, Freeman began applying for employment, and after sending out some twenty job applications, began working for an urgent care center in January, 2021. Freeman Dep., 77-81. At most then, Freeman suffered from a transitory and minor impairment. *See e.g., Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 260 (3d Cir. 2014) (holding broken finger resulting in lost use of three fingers for two months transitory and minor impairment); *Payne v. Woods Services, Inc.*, 520 F. Supp. 3d 670, 679 (E.D. Pa. 2021) (holding allegations in complaint that plaintiff's employer requested he return to work prior to end of COVID quarantine suggested employer did not consider employee to be disabled). As a transitory and minor impairment does not qualify for protection under the "regarded as" prong of the ADA or the PHRA, the Court finds Freeman has failed to establish a prima facie case and Moore Eye Care is entitled to the entry of summary judgment.[4]

Although unnecessary, the Court briefly notes that *even if* Freeman had succeeded in showing *any* evidence Moore terminated her employment because it regarded her as disabled, the evidentiary record clearly supports a finding that Moore demonstrated it acted for legitimate and nondiscriminatory reasons. That is, Moore terminated Freeman's employment because of her insubordinate remarks and behavior in response to Gallo's directive to get a COVID test and the threat directed against Amber Starling. *See, e.g.,* ECF 11, Exh. 14, 16-19. And, as there is

---

[4] Further, Freeman's repeated statements during her deposition testimony make clear she believes Gallo terminated her employment at Moore because Gallo thought Freeman had gotten other employees in the office sick – not because it believed her to be disabled by COVID. Freeman Dep. 72-74.

absolutely **nothing** in the record to rebut or suggest that these reasons are a pretext for discrimination, judgment in favor of the Defendant would properly be entered on this basis as well.

An appropriate Order follows.

BY THE COURT:

/s/ Juan R. Sánchez
_____
Juan R. Sánchez,        C.J